UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| FRANCINE CLARK-WOODS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:12-CV-878-JCH-NAB |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Francine Clark-Woods's ("Clark-Woods") application for disability insurance benefits under the Social Security Act, 42 U.S.C. § 423. Clark-Woods alleges pain in the right shoulder, left ankle, and right knee resulting in immobility, high blood pressure, back pain, nerves, and poor circulation in her hands. (Tr. 157.) This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) for a Report and Recommendation. [Doc. 5.]

**I.      Procedural Background**

On September 21, 2009, Clark-Woods completed an application for disability insurance benefits. (Tr. 117-126.) The Social Security Administration ("SSA") denied Clark-Woods's claim and she filed a request for a hearing before an administrative law judge ("ALJ"). (Tr. 53-54, 65-68.) The SSA granted Clark-Woods's request and the hearing took place on December 8,

---

[1] At the time this case was filed, Michael J. Astrue was the Commissioner of Social Security. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name and the Court may order substitution at any time. *Id.* The Court will order the Clerk of Court to substitute Carolyn W. Colvin for Michael J. Astrue in this matter.

1

2010. (Tr. 76-81, 32-52.) The ALJ issued a written decision on December 29, 2010, upholding the denial of benefits. (Tr. 13-31.) Clark-Woods requested review of the ALJ's decision from the Appeals Council. (Tr. 113.) On April 13, 2012, the Appeals Council denied Clark-Woods's request for review. (Tr. 1-3.) The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Clark-Woods filed this appeal on May 15, 2012. [Doc. 1.] The Commissioner filed an Answer. [Doc. 11.] Clark-Woods filed a Brief in Support of the Complaint. [Doc. 17.] The Commissioner filed a Brief in Support of the Answer. [Doc. 23.]

## II. ALJ's Decision

The ALJ found that Clark-Woods met the insured status requirements of the Social Security Act through December 31, 2013. (Tr. 15.) He determined that she had not engaged in substantial gainful activity since June 30, 2009. (Tr. 15.) The ALJ found that Clark-Woods had severe impairments of slight degenerative changes of the left ankle, degenerative disc disease of the cervical spine, status post right shoulder surgical repair, and obesity. (Tr. 16.) He determined, however, that the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 19.) The ALJ found that Clark-Woods had the residual functional capacity ("RFC") to perform the full range of medium work as defined in 20 C.F.R. § 404.1567(c). (Tr. 21.) Based on the RFC, the ALJ also determined that Clark-Woods was capable of performing past relevant work as a certified nursing assistant and as a production assembler. (Tr. 26.) This work did not require the performance of work-related activities precluded by the claimant's RFC. (Tr. 26.) Finally, the ALJ concluded that the claimant had not

been under a disability, as defined in the Social Security Act, from June 30, 2009, through the date of the decision. (Tr. 27.)

Clark-Woods argues that the ALJ's decision should be reversed because the ALJ (1) failed to point to "some" medical evidence for its findings of RFC, and (2) failed to capture the concrete consequences of her impairments in the hypothetical question asked to the Vocational Expert. The Commissioner asserts that the ALJ's decision is supported by substantial evidence on the record as a whole and should be affirmed.

## III. Administrative Record

The following is a summary of relevant evidence before the ALJ:

### A. Hearing Testimony

The ALJ held a hearing in this matter on December 8, 2010. (Tr. 32-52.) The ALJ heard testimony from Clark-Woods and Vocational Expert Delores Gonzalez. Clark-Woods was represented by counsel.

#### 1. Clark-Woods's Testimony

Clark-Woods provided the following testimony. She completed high school and attended one year of trade school. (Tr. 34-35.) She worked in a factory from 1994 to 1995 doing assembly line functions, where she would lift 12 pound boxes, until she left to attend CNA school. (Tr. 35-36.) Clark-Woods worked a number of different jobs in 1996, and in 1997 she began work as a nurse's aide. (Tr. 36.) She worked at Rosewood fairly steady in 1998 and in 2001-2002 she worked for the state of Missouri as a CNA. (Tr. 37.) Clark-Woods was working at Bravo Care in 2008 when she suffered an injury to her right shoulder. (Tr. 37.) She also received earnings in 2009 from the same job. (Tr. 37.) Clark-Woods received unemployment in 2009, 2010, and most recently in the summer of 2012. (Tr. 38.)

Clark-Woods testified that she had surgery on her right shoulder in 2009. (Tr. 38-39.) She currently has screws in her shoulder, which led to circulation problems in her hands, and nerve damage from surgery. (Tr. 39.) She testified that she can barely reach above her head and that her shoulder bothers her when she reaches in front, as if typing on a computer, because her fingers get numb. (Tr. 39, 44.) Clark-Woods experiences difficulty with picking items off the floor, twisting jars, pouring water, and opening bottles because she cannot feel what she is doing. (Tr. 45.) There are crooks and pains in her neck when she sleeps or gets up in the morning to try and stand. (Tr. 45-46.)

Clark-Woods testified that she had surgery on her left ankle and she has screws in it. (Tr. 39-40.) She currently has difficulty standing for more than 10-15 minutes before she needs to sit down and prop it up, anything longer and she becomes dizzy. (Tr. 46-47.) Clark-Woods testified that she spends majority of her time sitting with her leg propped up. (Tr. 47-48.) She also takes daily medication for high blood pressure but she testified that the medication does not seem to control her pressure and she still gets dizzy. (Tr. 40.)

Clark-Woods has been referred to doctors for depression, anxiety, and nerve problems. (Tr. 41.) She also testified that she has crying spells once a week due to her depression. (Tr. 42.) She takes medication for weekly anxiety attacks that come with shortness of breath, cold sweats, and a racing heart. (Tr. 42-43.) She's been on the medication since 2000 and she experiences drowsiness from it day and night. (Tr. 43.)

### 2. Testimony of Vocational Expert Delores Gonzalez

Ms. Gonzalez testified as followed. The VE testified that a hypothetical 50 year old individual with a high school education plus CNA course who could perform the full range of medium work, would be able to return to work as a production assembler and as a nurse's aide.

(Tr. 49.) A production assembler's position is classified as light, and a nurse aide's position is classified as medium. (Tr. 49.) A hypothetical individual with Clark-Woods's age, education, and background would have difficulty performing the production assembler job if the individual's right dominant hand goes numb such that she would not be able to effectively use it for grasping or fine fingering. (Tr. 50.) Additionally, she would be unable to perform as a nurse aide. (Tr. 50.)

The VE testified that if the same hypothetical individual had to prop her leg up and experienced secondary pain throughout the day, she would need to be accommodated. (Tr. 50-51.) Finally, the VE stated that if the hypothetical individual was drowsy, such that she could not follow simple instructions throughout the day, and would have to leave the workstation or not be able to stay on task while there, she would not be able to perform any of the work cited. (Tr. 51.)

## B. Medical Evidence

On October 3, 2006, Clark-Woods visited Washington University Medical Center complaining of left ankle pain. (Tr. 236-238.) She was diagnosed by Dr. Brett Grebing with bilateral pes planal valgus deformity[2], left posterior tibial tendonitis[3], and left talar osteochondral lesion.[4] (Tr. 234.) Dr. Grebing found that the source of her pain was most likely not her ankle, but her posterior tibial tendon and he prescribed aggressive physical therapy and orthotic usage. (Tr. 234.) On February 12, 2007, Clark-Woods underwent surgery for a left flatfoot and posterior tibial tendon reconstruction. (Tr. 239-241.) On February 23, 2007, Dr. Grebing noted

---

[2] Pes planal valgus is "a condition in which the longitudinal arch is broken down, the entire sole touching the ground" and "bent or twisted outward away from the midline or body." Stedman's Medical Dictionary 1356, 1926 (27th ed. 2000).
[3] Left posterior tibial tendonitis is the "inflammation" of the tibia on the left "backside of the body." Stedman's Medical Dictionary 1430, 1794, 1835 (27th ed. 2000).
[4] Talar osteochondral lesion is a "wound or injury" of the cartilage or "bone of the foot that articulates with the tibia and fibula to form the ankle joint." Stedman's Medical Dictionary 340, 987, 1282, 1784 (27th ed. 2000).

5

that the incisions were well healed and she had minimal swelling, good capillary refill in the toes, good sensation to light touch, and overall good alignment. (Tr. 224.) Four weeks after surgery, on March 14, 2007, Dr. Grebing found that the overall alignment of the foot looked good. (Tr. 222.)

Clark-Woods visited the Emergency Department of Northwest Healthcare on December 2, 2008, complaining of stress from work with symptoms of headache, dizziness, right arm tightness/tingling, and right chest pain. (Tr. 265, 269.) She was diagnosed as having an anxiety attack and chest pain and was told to follow up with her counselor or family doctor. (Tr. 277, 280.) Her after care instructions included rest, refrain from lifting heavy objects or strenuous exercise until the pain subsided, and to take medications as recommended. (Tr. 279.)

On December 21, 2008, Clark-Woods visited St. John's Mercy Medical Center with complaints of a right arm injury and pain. (Tr. 312.) She stated that she injured herself at work by lifting a patient who was dead weight, and she is unable to lift her arm above her head. (Tr. 312.) An x-ray showed that there was no fracture, dislocation, abnormal bone production, or destruction but there was osteoarthritis of the AC joint. (Tr. 329.) She was diagnosed with having muscle strain of her right arm. (Tr. 320.)

Clark-Woods saw Dr. Boris Khariton on January 23, 2009 at US MedGroup. (Tr. 340.) Clark-Woods complained of neck pain and right shoulder pain. (Tr. 340.) She had mildly limited range of motion of the cervical spine, primarily with left lateral bending and rotation, and pain with palpation over the cervical paraspinal muscles, right trapezius muscle and right periscapular muscles. (Tr. 341.) The range of motion of the right shoulder was about 70-75° of flexion and abduction. (Tr. 341.) An MRI of the cervical spine, dated January 30, 2009, showed a moderate to large disc herniation centrally, and towards the left C5-6, with a moderate sized

6

central herniation at C6-7. (Tr. 334.) The cervical spine MRI also showed a smaller right-sided disc protrusion at C7-T1 without definite root impingement. (Tr. 334.) An MRI of the right shoulder, dated January 30, 2009, showed a 1 cm tear at the insertion of the supraspinatus tendon anteriorly[5], probably with some impingement by acromioclavicular spurring.[6] (Tr. 335.)

On February 6, 2009, Dr. Khariton, opined that Clark-Woods' complaints of neck pain and right shoulder pain were due to a right supraspinatus tendon tear as well as degenerative disk disease of the cervical spine. (Tr. 336-337.) Dr. Khariton referred Clark-Woods to Dr. Samson, an orthopedic spine specialist, and Dr. Kostman, an orthopedic specialist. (Tr. 337.)

On February 11, 2009, Dr. Barry Samson found that Clark-Woods had a rotator cuff tear of the right shoulder and cervical spondylosis. (Tr. 347.) Dr. Samson found that while Clark-Woods had some cervical spondylosis[7] and changes in her neck, they were not the cause of any of her symptoms. (Tr. 347.) He stated, with a reasonable degree of medical certainty, that there was no impact from the injury that occurred in December of 2008 with any findings on the MRI of her cervical spine. (Tr. 348.) Dr. William C. Kostman saw Clark-Woods on February 12, 2009 and diagnosed her with AC joint degenerative change and a probable supraspinatus rotator cuff tear. (Tr. 344-345.)

On March 16, 2009, Clark-Woods underwent a right shoulder arthroscopic debridement of biceps stump, debridement of chondroplasty glenoid, subacromial decompression, and arthroscopic rotator cuff repair performed by Dr. Kostman (Tr. 379.) On March 25, 2009, Dr. Kostman noted that Clark-Woods was still in discomfort and suggested she use a sling at all

---

[5] The supraspinatus tendon is the "intrinsic muscle of the shoulder joint, the tendon of which contributes to the rotator cuff." Stedman's Medical Dictionary 1157 (27th ed. 2000).
[6] Acromioclavicular is defined as "relating to the cromion and the clavicle." Stedman's Medical Dictionary 18 (27th ed. 2000).
[7] Spondylosis is the "ankylosis, or stiffening, of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature." Stedman's Medical Dictionary 90, 1678 (27th ed. 2000).

times. (Tr. 407-408.) Clark-Woods's portal sites were well healed and she could forward flex to 70°. (Tr. 407.)

On April 2, 2009, Dr. Kostman found that Clark-Woods could flex to 165° and could discontinue use of her sling except when there were crowds or risk of injury. (Tr. 409). On April 12, 2009, Clark-Woods visited SSM DePaul Emergency Room with complaints of right shoulder pain and inadequate pain control despite shoulder immobilizer or Vicodin. (Tr. 367.) Clark-Woods reported that she did not like to take the Vicodin because it made her drowsy. (Tr. 369.) At SSM, she had tenderness to palpation of the clavicle, scapula, and glenohumeral joint, and she was diagnosed with shoulder pain and hypertension. (Tr. 368.)

From April 27, 2009 to May 15, 2009, Clark-Woods attended physical therapy for her shoulder at Concentra Medical Centers. (Tr. 484-488.) On April 30, 2009, Dr. Kostman found that the incision sites were well healed and she could forward flex passively to 170° and she was allowed to resume her driving activity and discontinue using her sling. (Tr. 382.) Her limitations also included no lifting greater than 15 pounds floor-to-chest, and no above the chest lifting. (Tr. 382.) She was also instructed to work on her range of motion at home by stretching. (Tr. 382.) Clark-Woods was seen by Dr. Kostman 8 weeks post-operation for evaluation on May 21, 2009, she reported stiffness and that she had not been doing her home exercises as instructed. (Tr. 381.)

On June 18, 2009, Clark-Woods reported to Dr. Kostman that she had been feeling well but was experiencing some back discomfort around her scapular. A physical examination showed she could forward flex to approximately 170°. It was also determined that she had reached maximum medical improvement and could resume regular activities. (Tr. 412.)

On December 9, 2009, Clark-Woods was examined by Dr. Arjun Bhattacharya. (Tr. 466.) She complained of pain in the left ankle along with discomfort and decreased range of movement in the right shoulder demonstrated by the inability to raise her right arm above shoulder level, and restriction of movement and weakness in the arm. (Tr. 466.) In relation to her ankle, she stated that she had discomfort, especially when she walked for more than half of a block or stood for more than 15-20 minutes. (Tr. 466.) Dr. Bhattacharya found that there was restriction of movement in the ankle, but noted that Clark-Woods did not use any assistive devices such as a cane, crutch, or walker. (Tr. 466, 468.) An X-Ray showed there was an internal fixation of left oscalsis with slight degenerative change of the left ankle. (Tr. 470.)

Dr. Dennis McGraw completed a RFC on January 12, 2010, where he found that Clark-Woods could occasionally lift 50 pounds and frequently lift 25 pounds. (Tr. 475.) Additionally, she could stand and/or walk, and sit, for about 6 hours in an 8 hour workday. (Tr. 475.) Dr. McGraw found that she had unlimited ability to push and/or pull and had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 475-477.)

### IV.  Legal Standard

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." § 42 U.S.C. 416(i)(1)(A).

The Social Security Administration uses a five-step analysis to determine whether a claimant seeking disability benefits is in fact disabled. 20 C.F.R. § 404.1520(a). First, the claimant must not be engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a). Second, the claimant must establish that he or she has an impairment or combination of impairments that

significantly limits his or her ability to perform basic work activities. 20 C.F.R. § 404.1520(c). Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the appendix to the applicable regulations. 20 C.F.R. § 404.1520(d). Fourth, the claimant must establish that the impairments prevent him or her from doing past relevant work. 20 C.F.R. § 404.1520(f). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity to perform a significant number of jobs in the national economy. *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). If the claimant satisfies all of the criteria under the five step evaluation, the ALJ will find the claimant to be disabled. 20 C.F.R. § 404.1520(a)(4)(v).

The court reviews the ALJ's decision to determine whether the factual findings are supported by substantial evidence. 42 U.S.C.A. §405(g). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision. *Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994).* Therefore, even if this court finds that there is a preponderance of evidence against the weight of the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. *Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997.)

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

  1. The findings of credibility made by the ALJ;
  2. The education, background, work history, and age of the claimant;
  3. The medical evidence given by the claimant's treating physicians';

4. The subjective complaints of pain and description of the claimant's physical activity and impairment;
5. The corroboration by third parties of the claimant's physical impairment;
6. The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and
7. The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

## V. Discussion

Clark-Woods asserts two errors on appeal. First, she asserts that the ALJ failed to consider "some" medical evidence to support its conclusion that she would be capable of performing the full range of medium work. Second, she finds that the Vocational Expert's testimony was not supported by substantial evidence because the hypothetical question asked did not capture the concrete consequences of her impairments.

### A. RFC Determination

Clark-Woods contends that the ALJ should have considered "some" medical evidence in concluding that she was capable of performing the full range of medium work. The ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000), but the "claimant's residual functional capacity is a medical question." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). RFC is determined based on the entire record of evidence, but "the record must include some medical evidence that supports the ALJ's RFC finding." *Dykes v. Apfel*, 223 F.3d 865, 866-67 (8th Cir. 2000) *see Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). A treating physician's opinion is given great weight, but "it does not automatically control or obviate the need to evaluate the record as whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) s*ee Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000). The regulations specifically provide that

the opinions of non-treating physicians may be considered. *Hacker v. Barnhart*, 459 F.3d 934, 939 (8th Cir. 2006). Additionally, an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment. *Harris v. Barnhart*, 365 F.3d 926, 931 (8th Cir. 2004).

The ALJ gave substantial weight to Dr. Chris Kostman, the treating physician, who treated Clark-Woods's right shoulder injury. The claimant, however, finds fault with the substantial weight given to the State agency medical consultant, Dr. Dennis McGraw. Clark-Woods asserts that the ALJ's decision relies upon a non-examining physician's opinion and that his evidence is to be given the least weight. Although an ALJ is not bound by findings made by state agency medical consultants, they are highly qualified physicians who are also experts in Social Security disability evaluations and their findings must be considered. 20 C.F. R. § 404.1527(e)(2)(i). The ALJ found that Dr. McGraw's opinion was the only medical opinion evidence in the record regarding the claimant's impairments and limitations and his opinion is very probative. The undersigned finds that Dr. McGraw's opinion was consistent with the objective medical evidence in the record, including the diagnostic imaging results and the objective findings of the consultative examiner, Dr. Bhattacharya. The opinion was consistent with that of Dr. Kostman who found that the claimant had improved so much, she could return to work as a CNA with no work restrictions. This undersigned finds that the ALJ properly considered the medical opinion testimony and the RFC determination is supported by substantial evidence in the record as a whole.

### B. Vocational Expert Determination

Clark-Woods asserts that the hypothetical question presented to the Vocational Expert was flawed because it did not capture the concrete consequences of her impairment, because it was based on an RFC that was not supported by substantial evidence. The ALJ's hypothetical must include the impairments that the ALJ finds are substantially supported by the record as a whole. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996) *see Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993). Accordingly, "testimony from a VE based on a properly-phrased hypothetical question constitutes substantial evidence." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996).

The ALJ found that Clark-Woods could perform the full range of medium work. (Tr. 21.) Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c), § 416.967(c). The undersigned has already determined that the RFC determination is supported by substantial evidence and the hypothetical was phrased in accordance with the RFC. Clark-Woods contends that it is based solely on the medical opinion of Dr. McGraw, a non-examining source. As explained above, the ALJ could consider Dr. McGraw's opinion along with the other evidence in the medical record. Dr. McGraw's opinion was supported by other medical evidence in the record, including Clark-Woods' treating physician's opinion that she could return to her work as a CNA. Therefore, the undersigned finds that the hypothetical question was properly phrased and the vocational expert's opinion constitutes substantial evidence in the record as a whole.

## VI. Conclusion

Based on the foregoing, the undersigned recommends that the ALJ's decision be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief which Plaintiff seeks in her Complaint be **DENIED**. [Doc. 1]; [Doc. 17]

**IT IS FURTHER RECOMMENDED** that Judgment be entered in favor of the Commissioner.

**IT IS FURTHER ORDERED** that the Clerk of Court substitute Carolyn W. Colvin for Michael J. Astrue in the court record of this case.

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this 30th day of August, 2013.

/s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE